Jeffrey MAUSOLF; William Kullberg; Arlys Strehlo; and Minnesota United Snowmobilers Association

v.

Bruce BABBITT, Secretary, Department of Interior; Roger Kennedy, Director, National Park Service; Mollie Beattie, Director, U.S. Fish and Wildlife Service; and Ben Clary, Superintendent, Voyageurs National Park.

No. 5–94–CV–8.

United States District Court,
D. Minnesota,
Fifth Division.

Jan. 23, 1996.

Rebecca J. Heltzer, Bernick & Lifson, Mpls, MN, Corey John Ayling, McGrann Shea Franzen Carnival Straughn & Lamb, Mpls, MN, for Jeffrey Mausolf, William Kullberg, Arlys Strehlo, Minnesota United Snowmobilers Association.

Friedrich Anson Paul Siekert, David Lee Lillehaug, U.S. Atty. Office, Mpls, MN, Joseph R. Perella, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, for Bruce Babbitt, Secretary, Department of the Interior, Roger Kennedy, Director, National Park Service, Mollie Beattie, Director, U.S. Fish and Wildlife Service, Ben Clary, Superintendent, Voyageurs National Park.

Richard A. Duncan, Brian Boru O'Neill, Michael A. Ponto, Laura A. Lundquist, Faegre & Benson, Mpls, MN, for amici curiae Voyageurs Region National Park Association, Sierra Club, North Star Chapter, Humane Society of U.S., Friends of Boundary Waters Wilderness, National Park and Conservation Association, Izaak Walton League of America.

## ORDER

ROSENBAUM, District Judge.

In December, 1992, the National Park Service ("NPS" or "Park Service") closed certain lakeshore areas in Voyageurs National Park ("Voyageurs" or "Park") to snowmobiles and motor vehicles. The closed areas are home to gray wolves and bald eagles, each of which is protected under the Endangered Species Act ("ESA" or "Act").[1] The Park Service's

---

1. The parties do not dispute the validity of the lakeshore closures during the bald eagles' breeding period. *See infra.*

closure was imposed without notice or public consideration, ostensibly to prevent the possible taking of individual wolves and bald eagles and to protect the species' population and habitat.[2]

Plaintiffs are snowmobilers who claim the lakeshore closures violated the ESA and the Administrative Procedure Act ("APA"). They seek declaratory and injunctive relief. Defendants, in turn, deny that plaintiffs have standing to make their claim; assert the closures were neither arbitrary nor capricious; and deny the NPS was required to initiate or participate in any rulemaking procedures before closing the areas to snowmobiles. Each party has submitted briefs and argued before the Court seeking summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."). The parties agree there are no disputed facts and this case raises purely legal issues that can be resolved on these motions.

I. *Background*

A. **The Endangered Species Act**

In 1973, Congress enacted the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, to protect America's endangered and threatened wildlife. Section 9 of the Act makes it unlawful for any person to "take" any species listed as endangered or threatened. 16 U.S.C. § 1538(a)(1)(B)–(D). "Take" is statutorily defined to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Federal regulations define "harassment" as any act "which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." 50 C.F.R. § 17.3. The regulations define "harm" as "an act which actually kills or injures wildlife," and provide that "[s]uch act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential

behavioral patterns, including breeding, feeding or sheltering." *Id.*

Section 7 of the ESA prohibits federal agencies from taking any action "likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary [of the Interior] ... to be critical." 16 U.S.C. § 1536(a)(2). Federal agencies must formally consult the United States Fish and Wildlife Service ("FWS" or "Fish and Wildlife") concerning any prospective agency action that may affect listed species or their critical habitat. 16 U.S.C. § 1536(a)(3). After consultation, the FWS issues a biological opinion and determines whether the particular action is likely to jeopardize a species or adversely modify its critical habitat. 16 U.S.C. § 1536(b)(3)(A). Federal regulations require that the biological opinion be formulated using "the best scientific and commercial data available." 50 C.F.R. § 402.14(g)(8).

At section 10, the ESA authorizes the Secretary of the Interior ("Secretary") to issue permits allowing any taking, which section 9 would otherwise prohibit, "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). To issue such a permit, the FWS must provide an "incidental take" statement specifying the take's impact on the species and identifying "those reasonable and prudent measures ... necessary or appropriate to minimize such impact." 16 U.S.C. § 1536(b)(4).

B. **Voyageurs National Park**

Congress authorized the creation of Voyageurs National Park in 1971 and established it in 1975. Pub.L. No. 91–661. The Park is a northern Minnesota forest area, adjacent to the Canadian border. Glaciers have shaped its land to produce a system of internal waterways. The Park covers nearly 220,000 acres, of which 85,506 (39 percent) are water. The Kabetogama Peninsula accounts for almost half of the Park's land area.

---

**2.** All parties agree the Park's populations of gray wolves and bald eagles are stable. The parties also agree, however, that the Park's bald eagle

population is reproducing at lower rates than bald eagle populations in surrounding areas. *See infra.*

Prior to the Park's establishment, its land was freely logged, mined, and used for recreation. In establishing the Park, Congress sought "to preserve for the inspiration and enjoyment of present and future generations, the outstanding scenery, geological conditions, and waterway system which constituted a part of the historic route of the Voyageurs who contributed significantly to the opening of the Northwestern United States." 16 U.S.C. § 160.

## C. Bald Eagles

The bald eagle is classified under the ESA as a threatened species in Minnesota. Between 13 and 21 breeding eagle pairs have occupied Voyageurs since annual surveys began in 1973. U.S. Fish & Wildlife Service, *Administrative Record for the Voyageurs National Park Wilderness Plan Consultation*, Tab 13, at 8 [hereinafter *Admin.Rec.*]. Although the Park's bald eagle population is presently stable, its reproductive success has been below replacement. The Park's eagles reproduce at lower rates than do eagles in the adjacent Superior and Chippewa National Forests. *Admin.Rec.*, Tab 46.

The causes of these low reproductive rates are unknown. Many theories have been posited, but none is recognized as the "cause" by wildlife experts. Among the possibilities is human disturbance during the breeding cycle, which may cause eagles to metabolize fat reserves containing polychlorobiphenyl ("PCB") and mercury. According to this theory, such metabolism increases contaminant levels in eagle eggs.[3] *Id.*, Tab 46, at 12.

Bald eagles return to Voyageurs in late February. Upon their arrival, eagles scavenge on fish and wolf kill remains until the ice melt in late April or early May. Under the PCB metabolism theory, the critical disturbance period for bald eagles extends from courtship in late February through incubation in mid-May. *Id.*, Tab 29, at 14–15. As a result, the plaintiffs do not dispute the validity of temporary closures of trails within a quarter mile of bald eagle nests during the eagles' breeding season, but do challenge the validity of permanent closures of such trails outside the breeding period.

## D. Gray Wolves

The gray wolf is also classified as threatened in Minnesota. Northeastern Minnesota contains one of the United States' most significant gray wolf populations. The best estimates count between 1,200 and 1,400 wolves in Minnesota. Wildlife experts recognize that the gray wolf's numbers are slowly increasing and their range is expanding. *Id.*, Tab 29, at 16. Voyageurs maintains an average population of 35 individual wolves with an annual survival rate of 85 percent. These wolves comprise between 6 and 9 wolf packs, with 2 to 11 wolves per pack. Only half of Voyageurs' identified packs have territories completely within the Park.

Frozen surfaces of major lakes are important hunting areas for Voyageurs wolves. This is especially true during light-snow winters; during periods of heavy snow, wolves make most kills in wooded areas. *Id.*, Tab 15. It is recognized that snowmobiles can cause temporary dispersal of wolves. As a result, the Park Service has groomed and marked trails on lake surfaces to channel snowmobilers away from the shoreline, thereby preventing disruption of wolves feeding on kills. *Id.*, Tab 19, at 11. Beyond this temporary dispersal, snowmobiles seem to pose no other threat to wolves.

An estimated 80 percent of wolf mortality within Minnesota is caused by humans. This includes animals shot, hit by cars, or snared and killed by trappers. Wolf packs having territories extending outside the Park, and wolves that venture beyond its borders, are especially vulnerable to human-caused mortality.[4] *Id.*, Tab 29, at 16. Wolves within the Park, which have adapted their behavior to human recreational activities such as snowmobiling, cross-country skiing, ice fishing, and motor vehicle use, are not as vulnerable to human-caused mortality as those beyond the Park's borders. *Id.*

**3.** Other possible factors include decreased fishery productivity and environmental contamination, such as toxic chemicals in the food chain. *Admin.Rec.*, Tab 46, at 12.

**4.** Wolves venturing across the border into Ontario, Canada, may be taken legally.

### E. Snowmobiles and Voyageurs National Park

The Voyageurs National Park Act recognized the land's historic recreational use by providing that "[t]he Secretary may, when planning development of the park, include appropriate provisions for (1) winter sports, including the use of snowmobiles." 16 U.S.C. § 160h. This express authorization of snowmobiling in Voyageurs is unique to the Park's enabling legislation.[5] Partly based on this authority, snowmobile use remained unregulated until well after the Park was established, pending assessment of snowmobiling's effect on wildlife.

#### 1. 1991 Regulations

The NPS issued its first Voyageurs snowmobiling regulations in January, 1991. *See* 36 C.F.R. § 7.33(b) (1991). These regulations expressly allowed snowmobiling on virtually all of the Park's frozen lake surfaces. *Id.* They also authorized the Park Superintendent to temporarily close trails or lake surfaces, after "taking into consideration public safety, wildlife management, weather, and park management objectives." *Id.* § 7.33(b)(3).

The Park Service promulgated the 1991 regulations after determining that snowmobiling was generally insignificant in its impact on wildlife. This determination was based on a series of NPS and FWS investigations and reports. In its 1989 draft trail plan, for example, the NPS found that "[p]ersons on foot (hikers, skiers, or snowshoers) seem to have greater effects than snowmobilers do by causing animals to run sooner and farther than they run from snowmobiles." *See id.*, Tab 13, at 16. The NPS made similar findings in its 1990 environmental assessment, which evaluated the potential impact of lake surface snowmobiling. *Id.*,

Tab 29. The 1990 assessment anticipated that passing snowmobiles or other winter recreationists would sometimes displace wolves feeding on deer carcasses along shorelines. The report then determined that, because wolves normally hunt and devour their kills in the evenings and early mornings, and because they spend relatively short periods of time on a kill, there was little chance for long-term displacement. The NPS assessment noted,

> Although the frequency of displacement by winter recreationists and return of wolves to prey have not been formally studied at Voyageurs, if winter recreationists have a significant detrimental effect on the park's wolf population, it has not been reflected in the relative stability of the population during the first 15 years of the park's existence.

*Id.*, Tab 29, at 10.

The Fish and Wildlife Service made similar findings in its April, 1989, biological opinion. The opinion stated that the NPS's proposed snowmobile trail across the Kabetogama Peninsula would not jeopardize the continued existence of the gray wolf in Minnesota or adversely modify its critical habitat.[6] *Id.*, Tab 19, at 12. The 1989 opinion added that restricting snowmobiles to established trails could benefit wolves. Nevertheless, Fish and Wildlife concluded that "no incidental take is anticipated to result from the [NPS's] proposed action and none is authorized." *Id.*, Tab 19, at 13. In June, 1990, the FWS reiterated its 1989 opinion and extended its application to snowmobile trails traversing lake surfaces. The FWS concluded that lake surface snowmobiling would not adversely affect the gray wolf or bald eagle beyond the impacts indicated in its 1989 opinion.[7] *Id.*, Tab 26.

---

5. By contrast, the Boundary Waters Canoe Area Wilderness Act of 1978, which established Voyageurs's sister park, expressly prohibits the use of "motor vehicles, motorized equipment ..., [or any] other form of mechanical transport" in the Boundary Waters Canoe Area. 16 U.S.C. § 1132(c).

6. The FWS noted its findings would need to be reassessed based on the first formal NPS report on gray wolf research. The research was to be completed by September, 1991, with a final re-

port due in 1992. No such report appears in the administrative record.

7. The FWS recognized that this finding was also subject to change based on gray wolf research and proposed research concerning the cumulative impacts of snowmobiles and other human-caused disturbances. The FWS stated, "While we share the general belief that such [cumulative] impacts may be insignificant, such opinions are primarily based on a loose collection of expert observation."

As it developed Voyageurs' snowmobiling regulations, the NPS also consulted with Dr. David Mech and other renowned wildlife biologists. Dr. Mech stated,

> I know of no evidence, or reason to believe, that snowmobiling ... or other winter sports will have a detrimental effect on the survival of [the Voyageurs] wolf population. Wolves' avoidance of well used human trails should cause them no real inconvenience nor should it interfere with their hunting.

*Id.*, Tab 7.

### 2. *The Fish and Wildlife Service's 1992 Biological Opinion*

In August, 1991, the NPS completed a draft wilderness plan recommendation and revised environmental impact statement for Voyageurs. The wilderness plan proposed continued motorized access to the major lake surfaces, 16 miles of snowmobile portages, and all lake surfaces connected by the Chain of Lakes trail. The plan also contemplated reduced snowmobile use on onland trails. This diminution was to be accomplished by limiting onland snowmobiling to a 12–foot wide track on the Kabetogama Peninsula. The NPS made this recommendation after concluding that snowmobiling on onland trails might adversely impact the gray wolf population. After issuing its wilderness plan, the Park Service requested a biological opinion from the FWS.

In preparing its biological opinion, Fish and Wildlife asked the Park Service for evidence of any harassment or taking of gray wolves within the park. *Id.*, Tab 44. The NPS responded that it had little evidence of harassment or takings. *Id.*, Tab 45, at 8. Concerning harassment, the Park Service reported "casual observations" suggesting that snowmobilers disturbed wolves feeding on kills along the shorelines of major lakes. The NPS received reports indicating that some snowmobilers may have removed choice cuts of meat from wolf-killed deer. The NPS concluded, however, that "[t]he extent to which a given wolf pack is disturbed and, once disturbed, abandons a kill is unknown."

The NPS reported two apparent aerial gunnings of wolves at Namakan Lake. The shootings occurred in December, 1986, and March, 1988. It was unclear whether either shooting occurred within the Park. The Court notes that the NPS could not substantiate any other rumors of wolves being killed illegally in the Park, but acknowledged that many wolves were illegally killed beyond its borders.[8]

In March, 1992, the FWS issued a biological opinion concluding that the proposed wilderness plan would not jeopardize the continued existence of the bald eagle or gray wolf in Minnesota or adversely affect the wolves' critical habitat. *Id.*, Tab 46. Notwithstanding this lack of empirical evidence or competent expert evidence to support it, Fish and Wildlife expressed concern over allowing snowmobiling across the Kabetogama Peninsula and on the major lakes. The FWS acknowledged that snowmobiler disruption of wolves hunting prey seemed insignificant on a case-by-case basis, but hypothesized that "repeated disruptions may lead to a cumulatively significant effect, particularly during periods of stress caused by severe weather or reduced prey availability." The FWS concluded with the unsurprising statement that "[i]nformation provided ... [by] the National Park Service points directly to the need for a better understanding of the impact of human disturbance on the gray wolf population in Voyageurs National Park."

Fish and Wildlife issued an incidental take statement along with its biological opinion. *Id.*, Tab 46. Based on the survival rate of wolves and reports of takings, the FWS decided that no more than six individual wolves could be taken incidental to the management of the Park.

In March, 1992, Fish and Wildlife directed the Park Service to implement trail closures consistent with its biological opinion and the

---

8. Human-caused mortality was significant on radio-collared animals venturing outside the Park between 1987 and 1989. Of 18 wolves fitted with radio collars in the fall of 1987, five were illegally killed outside of the Park within 18 months. In addition, two radio collars were recovered under circumstances suggesting the wolves wearing them had been killed. *See Admin.Rec.*, Tab 64, at 4.

incidental take statement. In a memo sent to NPS's midwest regional director in May, 1992, Voyageurs Park Superintendent Ben Clary expressed his disagreement with the opinion and the recommended closures. He stated, "The leading wildlife biologist[s], including the USFWS biologist, have once again stated that snowmobiling will not have [a] significant impact on the gray wolf. For this reason, we should question the opinion." *Id.,* Tab 49, at 4. Clary's memo concluded, however, that the "legal ramifications of the opinion" left him no choice but to implement the closures. On December 16, 1992, Clary issued an order closing 16 of the Park's lake bays and certain shoreline areas to motorized access during the winter.[9] *Id.,* Tab 53. The order was issued pursuant to 36 C.F.R. § 7.33(b)(3), which authorizes temporary closure of lake surfaces to achieve wildlife management objectives. No notice was published in the Federal Register and no comment period was allowed. The closures continued as the order was renewed in 1993 and 1994. *Admin.Rec.,* Tabs 57 and 59.

### 3. *1994 Supplement to the 1992 Biological Opinion*

The 1992 closures drew numerous objections, primarily from potential Park visitors who could no longer enjoy some of Voyageurs' finest scenery and natural experiences. Plaintiffs in this action filed a notice of intent to sue in the fall of 1993, and filed their complaint on January 1, 1994.

Upon receiving plaintiffs' notice of intent to sue, the FWS supplemented its 1992 biological opinion, ostensibly to clarify its position. This supplement, issued February 16, 1994, stated that the lakeshore closures were designed to minimize the harm, harassment,

and taking of gray wolves. *Id.,* Tab 64. The FWS explained that although snowmobiles themselves do not impact the gray wolf, the vehicles provide access for individuals who would harm the species. Thus, by selecting areas for closure known to be of greater habitat value to the gray wolf and their prey, it was the FWS's expressed intent to reduce the opportunity for adverse human/wolf contact.

The FWS characterized wolf harassment as "infrequent" but "not an unheard of event." *Id.,* Tab 64, at 5. The FWS listed four to five records of "incidents that constitute take by the harassment or harming of gray wolves." [10] *Id.,* Tab 64, at 6. The FWS also cited "numerous additional reports of harassment of gray wolves, ... most of which are anecdotal and not well documented." Fish and Wildlife acknowledged that "without documentation, there is little or no evidence that these incidents have resulted in a taking as defined by the ESA and its regulations."

In its 1994 supplement, the FWS also revised its incidental take statement. The FWS stated that the incidental take statement accompanying the 1992 biological opinion did not differentiate between wolves harmed by natural causes and wolves harmed by takings. Accordingly, in its 1994 supplement, the FWS estimated that roughly one incident of gray wolf taking occurred annually. Based upon these materials and this evidence, the FWS reduced the permissible number of incidental takings from 6 to 2 wolves per year. *Id.,* Tab 64, at 6.

### II. *Discussion*

Summary judgment is appropriate if there is no genuine issue as to any material fact

---

**9.** The restricted use areas are dispersed throughout the Park and total 6,541 acres or 7 percent of the Park's total water acreage and 3 percent of the total park acreage. The closures cover the entire northwest quadrant of Kabetogama Lake, as well as some smaller lakes and embayments of larger lakes in the park: (1) Rainy Lake—Cranberry Bay, Marion Bay, Browns Bay, southwest half of Saginaw Bay and an unnamed bay located immediately west of Laurins Bay; (2) Namakan Lake—Hammer Bay and Junction Bay; (3) Sand Point Lake—Swansons Bay, Brown Bay and an unnamed bay off the south of Grassy Bay; (4) Kabetogama Lake—eastern half of Sullivan

Bay, Lost Lake, Blind Ash Bay, the Lost Lake–Long Slu–Elks Bay complex, Daley Bay and Tom Cod Bay.

**10.** Evidence of takings of gray wolves includes deer carcass studies conducted by park personnel. Of 43 deer carcasses examined by park personnel in 1988 and 1989, two were found with evidence of human scavenging, indicating wolves had been driven off their kills. Many other deer carcasses consisted of remains that would leave no evidence of human scavenging. *Admin.Rec.,* Tab 64, at 4–5.

and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 246, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). In the present case, all parties agree there is no material fact in dispute, leaving their cross-motions for summary judgment ripe for decision.

## A. Standing

 Plaintiffs must meet the requirements of Article III standing to bring suit under the ESA. *Defenders of Wildlife v. Hodel,* 851 F.2d 1035, 1039 (8th Cir.1988); [11] *see also* 16 U.S.C. § 1540(g) (stating that "any person" may commence a suit to enjoin any person or government entity alleged to have violated the ESA). Contrary to defendants' suggestion, the Court does not find this to be an onerous burden. To establish Article III standing, plaintiffs must show that (1) they have suffered an injury in fact, (2) the injury can fairly be traced to the conduct complained of, and (3) the injury is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992) (citations omitted).

 Plaintiffs Jeffrey Mausolf, William Kullberg, and Arlys Strehlo are members of the Minnesota United Snowmobilers Association.[12] Their affidavits establish that they have used and wish to continue using the Park's now-restricted areas for snowmobiling and wildlife observation. Plaintiffs claim they have been harmed by the closures because they are prevented from observing wolves in their natural habitat. Plaintiffs also contend they have been injured because the closures were imposed without a proper basis under the ESA. They assert that the FWS has gone beyond the authority of the ESA by imposing unnecessary and insupportable restrictions.

Based upon these unchallenged assertions, the Court finds that plaintiffs, as individuals, meet the constitutional requirements for standing: they allege injuries in fact; the injuries are concrete, particularized, and immediate; the lakeshore closures imposed by defendants have caused these injuries; and the injuries can be redressed by the relief they seek. The plaintiffs have standing to bring suit under the ESA.

 Defendants offer a second line of defense: they assert that although plaintiffs may satisfy constitutional standing requirements, they lack standing under the Administrative Procedures Act. Defendants contend that plaintiffs' concerns fall outside the "zone of interests" protected by the Endangered Species Act because, according to defendants, plaintiffs' interest is in recreational snowmobiling and the ESA's interest is in species protection. Based on this dichotomy, defendants deny plaintiffs can bring an APA claim.

The APA provides that persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute" may bring suit to challenge a final agency action. 5 U.S.C. § 702. Accordingly, under the APA, plaintiffs must show the challenged agency action resulted in injury to an interest arguably within the "zone of interests" protected by the statute at issue. *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 893, 110 S.Ct. 3177, 3190–91, 111 L.Ed.2d 695 (1990); *Sierra Club v. Morton,* 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972).

 The prudential "zone of interests" test is to be broadly construed and is not especially demanding. *Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). "The essential inquiry is whether Congress 'intended for a par-

---

11. *Accord Babbitt v. Sweet Home Chapter of Communities for a Great Or.,* —— U.S. ——, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (plaintiffs with an economic interest in the forest products industry brought action under the ESA challenging regulations promulgated by Secretary of Interior). *But see Bennett v. Plenert,* 63 F.3d 915 (9th Cir. 1995) (applying "zone of interest" test of pruden-

tial standing to plaintiffs bringing suit under the ESA).

12. It appears to be unchallenged that the interests alleged by plaintiffs are sufficiently related to the purposes of the Minnesota United Snowmobilers Association such that the association has standing if any of its members do.

ticular class of plaintiffs to be relied on to challenge the agency disregard of the law.'" *Id.* at 399, 107 S.Ct. at 757 (quoting *Block v. Community Nutrition Inst.*, 467 U.S. 340, 347, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984)). There need only be a "plausible relationship" between the interests of the plaintiffs and the policies embodied in "the overall context" of the statute at issue. *Id.* at 401–02, 107 S.Ct. at 758–59.

In the present case, defendants argue plaintiffs' interests fall beyond those meant to be protected under the ESA. Defendants claim plaintiffs' true interest is in unlimited motorized access to the Park—they suggest plaintiffs have concocted their "concern" about decreases in wildlife observation solely to invoke federal jurisdiction. Defendants assert further that even if plaintiffs sincerely desire an opportunity to observe wildlife in the Park's restricted areas, they still lack standing because plaintiffs' claim does not flow from a risk of harm to wolves or bald eagles.

The Court rejects defendants' arguments. Certainly, in most environmental cases, plaintiffs' asserted interest is directly aligned with the listed species' interests, i.e., the plaintiff claims injury because the challenged agency conduct threatens to diminish or deplete the numbers of endangered animals available for observation. *See, e.g., Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (claiming construction of Tellico Dam would injure endangered snail darter); *Sierra Club v. Froehlke*, 534 F.2d 1289 (8th Cir.1976) (claiming construction of Meramec Park reservoir would jeopardize endangered Indiana bat). The Court finds, however, that interests other than those asserted on behalf of endan-

gered species also fall within the zone of interests protected by the ESA.

■ Standing "is not a concept that can be defined by strict metes and bounds and is not susceptible to facile application." *Banks v. Secretary of Ind. Family & Social Servs. Admin.*, 997 F.2d 231, 238 (7th Cir.1993). Although plaintiffs' immediate concern may not be protection of wolves or their habitat, the desire to observe an animal species, even for purely aesthetic purposes, is undeniably a cognizable interest for purposes of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. at 562–63, 112 S.Ct. at 2137–38 (citing *Sierra Club v. Morton*, 405 U.S. at 734, 92 S.Ct. at 1365). The Court finds that plaintiffs have expressed an interest within the ambit of the ESA.

■ Defendants contend, however, that plaintiffs' stated harm is not cognizable under the ESA and APA. The Court notes with interest that counsel for defendants could not identify a single potential plaintiff who would have standing to complain if the government took steps to "overprotect" listed species.[13] The Court is unwilling to adopt the view that the FWS is unrestrained if it cloaks any of its acts in the laudable robe of endangered and threatened species protection. This is a form of totalitarian virtue—a concept for which no precedent has been advanced and which is foreign to the rule of law. It is, instead, the Court's view that the FWS must operate within the parameters of the ESA. *See, e.g., Sweet Home Chapter of Communities for a Great Or.*, —— U.S. at ——, 115 S.Ct. at 2421 (O'Connor, J., concurring) (discussing regulations promulgated pursuant to the ESA and stating that "[o]ne can doubtless imagine questionable applications of the regulation that test the limits of the agency's authority").[14] Defendants ques-

---

**13.** The government, during oral argument, expressed the view that there is absolutely no judicial recourse for persons who contend the FWS acts overzealously on behalf of listed species. In response to a hypothetical posed by the Court, defendants asserted that the FWS could close the entire park to human access to minimize the possibility of any incidental takes of protected species. Defendants took the remarkable position that such an action would be immune from challenge, and entirely beyond review, because it *benefits*, rather than *harms*, endangered or threatened species. The government maintained

this position, even recognizing the extremely conjectural risk of incidental taking in this case.

**14.** Adopting defendants' position would restrain challenge and judicial review of species-protective measures to an agency's "upstream," as opposed to "downstream," action. That is, any agency action declared protective of a species would, *ab initio*, be immune from review. A court could only consider an agency action that was deemed inimical to a species' survival.

tion plaintiffs' true interest in challenging the lakeshore closures, but do not suggest that plaintiffs lack any concern for wolf protection in the Park. Thus, plaintiffs' interests are congruent with the purposes of the ESA because plaintiffs, too, are ultimately served by a thriving wolf population in Voyageurs Park.

### B. Authority Under the ESA to Implement the Closures

■■■■ The Court recognizes its obligation to accord agency determinations great deference. A court may overturn agency actions only if they are "arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *see also Froehlke*, 534 F.2d at 1301 (stating that agency action under the ESA is subject to the "arbitrary and capricious" standard of review). When an agency determination involves construction of an administrative regulation, rather than a statute, deference "is even more clearly in order." *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). If an agency's determination is supportable on any rational basis, a court must uphold it. *Production Credit Ass'n v. Farm Credit Admin.*, 783 F.Supp. 416, 417 (D.Minn.1991); *see also Bowman Trans., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) (stating that courts must not attempt to "substitute their judgment for that of the agency").

■■■■ Even under such a deferential standard of review, an unsupported agency decision is not sacrosanct. An action is considered arbitrary and capricious if the agency's explanation in support "runs counter to the evidence before the agency." *Defenders of Wildlife v. Administrator, Envtl. Protection Agency*, 688 F.Supp. 1334, 1348 (D.Minn. 1988) (Murphy, J.), *aff'd in part, rev'd in part on other grounds*, 882 F.2d 1294 (8th Cir.1989).

■■■■ Plaintiffs contend the lakeshore closures were arbitrary and capricious because: (1) the NPS and the FWS did not adequately explain the action; (2) the NPS and the FWS relied on anecdotal evidence in ordering the closures; and (3) the NPS and the FWS failed to consider important issues surrounding the closures. Defendants reply that the closures are "exceedingly reasonable" and based on the best available evidence.

The Court agrees with plaintiffs that defendants failed to explain adequately the reasons for the closures. Because the Court finds the government's explanation inadequate, the Court must remand the matter to the FWS and the NPS to allow them to supplement the administrative record. *See Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331, 96 S.Ct. 579, 582, 46 L.Ed.2d 533 (1976). In finding the government's explanation for the closures inadequate, the Court rejects plaintiffs' flat assertion that defendants may not rely on anecdotal evidence. Plaintiffs argue, in effect, that anecdotal evidence can never constitute scientific evidence sufficient to support ESA actions. Plaintiffs cite no cases in support of this proposition, and the Court declines to hold that anecdotal evidence can never be a basis for an ESA action. There remains, however, a deep concern whether wholly anecdotal evidence can constitute the "best scientific and commercial data available," required under the ESA.

A generous review of defendants' evidence reveals: Snowmobilers and other winter recreationists have apparently displaced some wolves feeding on kills along shorelines, but scientific evidence shows the likelihood of permanent displacement is less than minimal. Of the four validated reports of wolf takings, two were aerial gunnings, bearing no relation to snowmobile trail closures. One poacher drove a wolf off a kill and scavenged the remains, with neither evidence nor suggestion that a snowmobile was present. Finally, one snowmobiler apparently permanently displaced a wolf feeding on a kill. The only formal, scientifically prepared reports indicate that snowmobilers have no significant impact on wolf or eagle populations, although "generally accepted" principles indicate that increased Park access, by whatever means, will likely result in increased mortality among individual animals.

Upon reviewing this evidence, the Court finds it does not support the decision to limit snowmobiling, an activity that has gone on for many years within Voyageurs. The Court shares defendants' concern for any reported takings of Voyageurs wolves, but finds that the evidence presently in the record is inadequate to establish that curtailing snowmobiling will improve the condition of this stable population. *See Defenders of Wildlife,* 688 F.Supp. at 1348.

The Court finds the agency's conclusion that these lakeshore closures are reasonably necessary to prevent incidental takings of Voyageurs wolves and bald eagles is based on little more than speculation. In the end, the FWS and the NPS simply contend that temporary displacements of these species may evolve into permanent displacements if snowmobilers are allowed continued access to lakeshore trails. There is absolutely no evidence in the record to support this proposition. Indeed, the only record evidence is to the contrary: both the FWS and the NPS have reported that temporary dispersal rarely results in permanent displacement from a kill. *Admin.Rec.,* Tabs 19, 26, and 29. *See Sweet Home Chapter of Communities for a Great Or.,* —— U.S. at ——, 115 S.Ct. at 2420 (O'Connor, J., concurring) (discussing the definition of "harm" under the ESA and stating that "the regulation clearly rejects speculative or conjectural effects").

Defendants finally cling to the argument that the lakeshore closures are reasonable because of the "generally accepted" principle that increased access to wildlife will result in increased mortality. This argument, too, falls short. This "generally accepted" principle applies equally to any mode of transportation—snowmobiles, motor vehicles, skis, snowshoes, hiking, or aircraft. The value, if any, of a snowmobile bar on the basis of such evidence is purely speculative. *See id.* (O'Connor, J., concurring) (stating that speculation will not support agency actions under the ESA); *Greenpeace Action v. Franklin,*

14 F.3d 1324, 1337 (9th Cir.1992) (upholding measures promulgated under the ESA "premised . . . on a reasonable evaluation of available data, not on pure speculation").

The danger of premising lakeshore closures on "generally accepted principles," rather than on particularized evidence, is apparent. Facile resort to the precept that "increased access leads to increased mortality," if taken to its logical extreme, would allow the FWS and the NPS to close Voyageurs altogether. This was not Congress's intent when it established Voyageurs.

### III. *Conclusion*

Having found that the government's explanation for the lakeshore closures is presently inadequate, the Court remands this matter to the FWS and the NPS to supplement the administrative record. *See Federal Power Comm'n,* 423 U.S. at 331, 96 S.Ct. at 582. Pending a sufficient explanation for the closures, the Court enjoins their enforcement, pursuant to 16 U.S.C. § 1540(g)(1)(A).[15]

Accordingly, IT IS ORDERED that:

1. Plaintiffs' motion for summary judgment is granted.

2. Defendants' motion for summary judgment is denied.

3. This matter is remanded to the FWS and the NPS for further evidentiary findings consistent with this opinion. Pending further explanation from these agencies, defendants are enjoined from enforcing the lakeshore closures.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

**15.** The Court's determination that the lakeshore closures are, at present, invalid does not extend, of course, to the closure of trails surrounding eagles' nests during the eagles' breeding season. As already noted, the parties have stipulated that such closures are valid.

Because the Court determines the lakeshore closures, beyond the eagles' breeding season, are invalid under the ESA, it need not address at this time plaintiffs' argument that the closures violate the APA.