**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**
No. 96-1856

| | | |
|---|---|---|
| Jeffrey Mausolf; William Kullberg; Arlys Strehlo; Minnesota United Snowmobilers Association, | * * * * | |
| Plaintiffs - Appellees, | * * | |
| v. | * * | |
| Bruce Babbitt, Secretary, Department of the Interior; Roger Kennedy, Director, National Park Service; Mollie Beattie, Director, U.S. Fish and Wildlife Service; Ben Clary, Superintendent, Voyageurs National Park, | * * * * * * * * | Appeal from the United States District Court for the District of Minnesota. |
| Defendants; | * * | |
| Voyageurs Region National Park Association; Sierra Club, North Star Chapter; Humane Society of the United States; Friends of the Boundary Waters Wilderness; National Park and Conservation Association; Izaak Walton League of America, | * * * * * * * | |
| Intervenor Defendants - Appellants. | * * | |

Submitted: December 12, 1996
Filed: September 23, 1997

_____

Before BOWMAN and HEANEY, Circuit Judges, and STROM,[1] District Judge.

_____

BOWMAN, Circuit Judge.

The Voyageurs Region National Park Association and other conservation groups (collectively, "the Association") appeal from the decision of the District Court granting summary judgment to the Minnesota United Snowmobilers Association, Jeffrey Mausolf, and other individual snowmobiling enthusiasts ("the Snowmobilers"), who sued the Secretary of the Interior and other governmental defendants seeking to enjoin the enforcement of restrictions on snowmobiling in Voyageurs National Park ("the Park"). See Mausolf v. Babbitt, 913 F. Supp. 1334 (D. Minn. 1996). We postponed issuing our decision in this case based on counsels' representations at oral argument that the parties hoped to negotiate a settlement. It appears, however, that the parties have been unable to reach an agreement, necessitating our resolution of this matter. We reverse.

**I.**

Establishment of Voyageurs National Park was authorized in 1971. See Pub. L. 91-661, 84 Stat. 1970 (codified as amended at 16 U.S.C. §§ 160-160k (1994)). Snowmobiling, which had been engaged in freely both prior to and after the Park's establishment, continued pending the results of wildlife-impact studies conducted by

_____

[1]The Honorable Lyle E. Strom, United States District Judge for the District of Nebraska, sitting by designation.

the National Park Service (NPS).  See Mausolf, 913 F. Supp. at 1338.  Although snowmobiling generally is prohibited in national parks, see 36 C.F.R. § 2.18(c) (1996),[2] the Voyageurs Park enabling legislation authorized the Secretary of the Interior to permit snowmobiling in the Park.  See 16 U.S.C. § 160h (1994) ("The Secretary may, when planning for development of the park, include appropriate provisions for (1) winter sports, including the use of snowmobiles . . . .")  In 1991, the NPS issued regulations, pursuant to statutory authority granted by Congress, see, e.g., 16 U.S.C. § 3 (1994), based on the results of a series of environmental- and wildlife-impact reports, allowing snowmobiling on nearly all of the Park's lake surfaces and on certain overland trails and portage routes.  See 36 C.F.R. § 7.33(b).  These regulations also specifically authorize the superintendent of Voyageurs National Park to close portions of the Park temporarily after "taking into consideration . . . wildlife management, . . . and park management objectives."  Id. § 7.33(b)(3).   The Association filed suit in federal court claiming that, because the NPS failed to prepare a wilderness plan outlining the effects of the proposed regulations, the regulations were illegal.  In an unpublished opinion, the District Court ordered that a wilderness plan be prepared and submitted as required by applicable regulations, but refused to enjoin snowmobiling in the Park.  Voyageurs Region Nat'l Park Ass'n v. Lujan, No. 4-90-434, 1991 WL 343370, at *11-14 (D. Minn. Apr. 15, 1991), aff'd, 966 F.2d 424 (8th Cir. 1992).

In August 1991, the NPS, in accordance with the District Court's order, proposed a draft wilderness plan which reduced the Park areas available for overland snowmobiling but permitted the activity on major lakes, some designated portage routes, and the Chain of Lakes Trail.  The NPS made this recommendation after concluding that snowmobiling on overland trails might adversely impact the gray wolf

---

[2]All citations refer to the Code of Federal Regulations revised as of October 1, 1996.  The pertinent sections have not been amended since the time period relevant to this case.

population.  The NPS then requested a "biological opinion"[3] from the Fish and Wildlife Service (FWS) concerning the effects, if any, of the proposed action on gray wolf, bald eagle, and other animal populations in the Park.  In March 1992, the FWS concluded that the NPS's proposed wilderness plan would not jeopardize the animals' survival or adversely affect their critical habitats.  However, the FWS acknowledged that snowmobiler disruption of wolves while hunting prey, although likely insignificant in isolation, could lead to cumulatively significant negative effects if the disruptions were frequent. The FWS directed that the NPS close specific trails, lakeshores, and lakes to snowmobiles and other motorized vehicles, including areas that had been exempted from closure under the NPS's originally submitted wilderness plan.

Thereafter, in December 1992, Park officials issued an order[4] closing sixteen of the Park's lake bays and certain shoreline areas to snowmobiling pursuant to authority granted under 36 C.F.R. § 7.33(b)(3) (authorizing temporary closure of lake surfaces for wildlife-management purposes).  This order, which was renewed in 1993 and 1994,

---

[3]Under 16 U.S.C. § 1536(a)(2) (1994), each federal agency must consult with the Fish and Wildlife Service (FWS) prior to taking any action "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat."  After such consultation, the FWS provides "a written statement setting forth the [FWS's] opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat."  Id. § 1536(b)(3)(A).

[4]The closure order was issued through "The Compendium for Voyageurs National Park," a document published annually and operating as the summary of the rulemaking implemented under the discretionary authority of the Park Superintendent. This document "serves as public notice" and "contains only a few of the laws and regulations pertaining to the administration of the park."  1993 Compendium.  The compendium is intended to be "used in conjunction with Title 36, Code of Federal Regulations, sections 1 through 7."  Id.

reduced the Park areas available for snowmobiling.[5] In 1994, the FWS supplemented its biological opinion, stating that the lakeshore closures were designed to minimize the harm, harassment, and taking of gray wolves. The FWS, expressing its intent to reduce adverse human/wolf contact, explained that while snowmobiles themselves do not adversely impact the gray wolf, the vehicles provide access to remote wolf-habitat areas for individuals who could intentionally or unwittingly harm the species or its individual members. Five "incidents that constitute take by the harassment or harming of gray wolves,"[6] and "numerous additional reports of harassment of gray wolves, . . . most of which are anecdotal and not well documented," were cited by the FWS as support for the closures. 1996 Supplement to Biological Opinion at 6. The FWS revised its initial incidental take statement,[7] reducing the permissible number of

---

[5]The restricted use areas account for seven percent of the Park's total water acreage and three percent of the Park's total acreage. See Mausolf, 913 F. Supp. at 1340 n.9.

[6]The definition of "take" is "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19) (1994). "Harass" is further defined to include any act that "creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." 50 C.F.R. § 17.3. "Harm" is defined as an act "which actually kills or injures wildlife" and may include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." Id.

[7]If the FWS concludes in its biological opinion that the proposed agency action is not likely to jeopardize the continued existence of the species as a whole, but may result in the taking of individual members of the species, the FWS must prepare an incidental take statement which permits an agency to "take" individual members of a protected species if the taking is not the purpose of the action and is therefore "incidental" to the agency action. See 16 U.S.C. § 1536(b)(4); 50 C.F.R. §§ 17.3, 402.14(i). This statement from the FWS authorizes the agency to take a limited number of animals, determined by the FWS, if the agency complies with certain terms and conditions. See 16 U.S.C. §§ 1536(o)(2), 1536(b)(4) (1994).

incidental takings of gray wolves from six wolves to two wolves per year.

In January 1994, the Snowmobilers sued the Secretary of the Interior and other governmental defendants claiming that the FWS's biological opinion did not support the closures ultimately ordered, and that the closures were therefore arbitrary, capricious, and in violation of the Endangered Species Act, 16 U.S.C. §§ 1531-1544 (1994) (ESA), and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (1994) (APA). The Snowmobilers argued that the Secretary, through the NPS and the FWS, had engaged in an unexplained and unwarranted "about face" on the snowmobiling issue and had not considered the best available scientific and commercial information before issuing the new restrictions. The Association, hoping to defend the closures, moved to intervene, arguing that the NPS had historically permitted unrestricted snowmobiling in the Park despite regulations prohibiting such activity and despite its adverse environmental effect, and that the NPS could not be counted on to protect the Association's interests in wildlife conservation and enjoyment of the Park.

The District Court denied the Association's motion to intervene, noting that under the parens patriae doctrine, governmental entities are presumed to represent the interests of all their citizens. See Mausolf v. Babbitt, 158 F.R.D. 143, 147-48 (D. Minn. 1994). The Association appealed the District Court's decision denying its motion to intervene, and we reversed, holding that the Association possessed the requisite Article III standing to intervene and that the Association had rebutted any presumption that the governmental entities would adequately represent its interests. See Mausolf v. Babbitt, 85 F.3d 1295, 1304 (8th Cir. 1996).

While the Association's appeal on the intervention issue was pending before this Court, the District Court issued its decision on the merits of the Snowmobilers' challenge to the NPS's Park closure regulations. See Mausolf v. Babbitt, 913 F. Supp. 1334 (D. Minn. 1996). The District Court, relying solely on the provisions of the ESA, enjoined enforcement of the Park closure regulations, noting that the government

"failed to explain adequately the reasons for the closures" and that the "evidence presently in the record is inadequate to establish that curtailing snowmobiling will improve the condition" of the gray wolf population. Id. at 1343-44. Because it appeared that the Association's intervention appeal would not be decided by this Court before the expiration of the time period for filing a notice of appeal from the District Court's merits decision, and because the Association wished to preserve its right to appeal the District Court's decision on the merits should its motion to intervene be granted on appeal, the Association timely filed a notice of appeal from the District Court's decision on the merits. The governmental defendants likewise filed a notice of appeal from this decision, but eventually dismissed their appeal. The Association, having been granted the right to intervene by this Court, now appeals the District Court's judgment on the merits.

## II.

We initially address the Snowmobilers' contention that we lack jurisdiction to entertain this appeal. The Snowmobilers first argue that because the Association was not a party to the litigation when its notice of appeal from the merits decision was filed and did not become a party until after the time period for filing had expired, the Association's notice of appeal was ineffective and we therefore lack jurisdiction to consider this appeal. We disagree.

"If final judgment is entered with or after the denial of intervention, . . . the applicant should be permitted to file a protective notice of appeal as to the judgment, to become effective if the denial of intervention is reversed." 15A Charles Alan Wright et al., Federal Practice and Procedure § 3902.1, at 113 (2d ed. 1991). A contrary rule would prevent a prospective intervenor who successfully appeals the district court's denial of his intervention motion from securing the ultimate object of such motion-- party status to argue the merits of the litigation--if, as was the case here, the appellate court does not resolve the intervention issue prior to the district court's final decision

on the merits. The Snowmobilers, in support of their argument against jurisdiction, direct our attention to Jenkins v. Missouri, 967 F.2d 1245 (8th Cir.), cert. denied, 506 U.S. 1033 (1992), for the proposition that the Association's notice of appeal was not timely and therefore not effective. Contrary to the Snowmobilers' characterization of Jenkins, however, the case stands merely for the proposition that if no motion to intervene is pending, a party cannot file a valid notice of appeal. See id. at 1248. Here, however, the Association was awaiting a final decision from this Court on its intervention motion when it timely filed a notice of appeal from the merits decision. "The rule that only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment, is well settled." Marino v. Ortiz, 484 U.S. 301, 304 (1988) (emphasis added). The Association properly became a party to this lawsuit and, as such, is entitled to appeal the judgment of the District Court.

The Snowmobilers next argue that because the government dismissed its appeal from the District Court's merits decision, "[t]he present case is over" and the Association may not appeal. Appellees' Br. at 25. The Snowmobilers, citing Diamond v. Charles, 476 U.S. 54 (1986), maintain that the effect of the government's dismissal "is that [sic] same as if the Government had formally rescinded, repealed, and abandoned its regulations." Appellees' Br. at 23. According to the Snowmobilers, "[t]hird parties," such as the Association, "do not have standing to force the government to reenact a legal code that the government has chosen to abandon." Id. Again, we disagree.

The Supreme Court noted in Diamond that "an intervenor's right to continue a suit in the absence of the party on whose side intervention was permitted is contingent upon a showing by the intervenor that he fulfills the requirements of Art. III." Diamond, 476 U.S. at 68. This Court summarized Diamond when we reversed the District Court's denial of the Association's motion to intervene, noting that Diamond stands for the proposition that "an intervenor may not appeal, or continue a suit, without the party on whose side intervention was permitted, unless [the] intervenor has Article

III standing." <u>Mausolf v. Babbitt</u>, 85 F.3d at 1299. We determined in that appeal that "[t]he Association has alleged concrete, imminent, and redressable injuries in fact, which are neither 'conjectural' nor 'hypothetical'," so that the Association has established Article III standing to intervene in this litigation. <u>Id.</u> at 1302 (citation omitted).

Because we have already determined that the Association possesses Article III standing, the only question remaining is whether an Article III case or controversy remains after the NPS dismissed its appeal. We believe that it does. In holding that the lakeshore closures violate the ESA, and in neglecting to consider the NPS's independent regulatory authority to order such closures, the District Court has directly impacted the Association's interests in observing and enjoying Park wildlife--including gray wolves--without the potential interference of snowmobiles. The District Court's ruling, effectively limiting the NPS's discretion to order such closures in the future, will likely continue to impair the Association's interests. The NPS's decision not to appeal from the District Court's adverse ruling on the merits emphasizes the disparity between its interests and those of the Association and confirms that the Association's "concrete, imminent, and redressable injuries in fact" are likely to recur. <u>Id.</u> at 1302.

Moreover, contrary to the Snowmobilers' assertions, the Association is not seeking to "enforce" the lakeshore closures. The Association is merely seeking to protect its own interests in wildlife conservation and to ensure that the government's discretion to promulgate regulations in furtherance of these objectives is not improperly restricted. In <u>National Wildlife Fed'n v. Lujan</u>, 928 F.2d 453 (D.C. Cir. 1991), a case much like the one before us, an environmental group challenged the validity of a mining regulation, and two industry associations intervened to defend the regulation. When the district court struck down the regulation, the industry groups, but not the government, appealed. The appellate court determined that the case was not moot and allowed the intervenors to act as sole appellants, reasoning that, "because the [government] has not promulgated a new regulation removing the [invalid portion of]

the current regulation, [the intervenors] could benefit from an appellate decision reversing the district [court] . . . and upholding the current regulation." Id. at 456 n.2. Here, the government has not revoked the closure order enjoined by the District Court, and the Association would likely benefit from our decision reversing the District Court and upholding that closure order. We conclude that because the Association has standing to challenge the District Court's decision and timely filed its notice of appeal and because a case and controversy still exists, we have jurisdiction to consider the Association's appeal.

## III.

An administrative agency enjoys broad discretion in carrying out the mandates of its governing statutes, see Chevron, U.S.A., Inc. v. Natural Resources Defense Council Inc., 467 U.S. 837, 866 (1984), and we will set aside an agency's action only upon a showing that the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A) (1994); see also Udall v. Tallman, 380 U.S. 1, 16 (1965) ("When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order."). The appellate court "must make an independent decision based on the same administrative record that was before the factfinder." Sierra Club v. Davies, 955 F.2d 1188, 1192 (8th Cir. 1992). This standard of review requires that the reviewing court defer to the agency's decisions in matters within its area of expertise, see Bankruptcy Estate of United Shipping Co. v. General Mills, Inc., 34 F.3d 1383, 1390-91 (8th Cir. 1994), and this Court "is not permitted to substitute its judgment for that of the agency," Sierra Club, 955 F.2d at 1192-93 (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)). Regulations promulgated by an agency will be upheld if they are "'reasonably related to the purposes of the enabling legislation.'" Voyageurs Region Nat'l Park Ass'n v. Lujan, 966 F.2d 424, 427 (8th Cir. 1992) (citation omitted). "While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may

reasonably be discerned."  Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285-86 (1974) (citation omitted).

## IV.

Snowmobiling is a prohibited activity in national parks except where the NPS has promulgated special regulations designating areas open to snowmobiling, and even then it is allowed only where such "use is consistent with . . . park management objectives, and will not disturb wildlife or damage park resources."  36 C.F.R. § 2.18(c).  Congress endowed the Secretary of the Interior with discretion to permit snowmobiling in Voyageurs National Park when statutes establishing the Park were enacted:  "The Secretary may, when planning for development of the park, include appropriate provisions for (1) winter sports, including the use of snowmobiles . . . ."  16 U.S.C. § 160h (1994).  Consistent with the NPS's responsibility to manage and regulate Park resources, the NPS has been given wide latitude to make management decisions regarding the type and scope of activities permitted on Park property.

The District Court analyzed the propriety of the NPS's Park closures solely under the authority granted to the agency by the ESA and concluded that the closures were invalid.  The ESA represents a congressional directive that all federal agencies "shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of [the Act]."  16 U.S.C. § 1531(c) (1994).  In keeping with Congress's stated purpose to protect wildlife, the ESA prohibits federal agencies from taking any action that is "likely to jeopardize the continued existence of any endangered species or threatened species," 16 U.S.C. § 1536(a)(2) (1994),[8]  and

---

[8] The Association concedes on appeal that permitting snowmobiling in the areas previously subject to the NPS Park closure, as ordered by the District Court, will not jeopardize the continued existence of the gray wolf.  See, e.g., 50 C.F.R. § 402.02 (defining "jeopardize" to include any action that reasonably would be expected to "reduce appreciably the likelihood of both the survival and recovery of a listed species

-11-

prohibits any person, including a governmental agency, from "taking" any individual member of a threatened or endangered species population, see 16 U.S.C. § 1538(a)(1)(B) (1994) (endangered species); 50 C.F.R. § 17.31 (1995) (threatened species).  Under these two provisions, the ESA operates to protect both the survival of entire populations of endangered or threatened species and the survival of individual members of each such species.

The District Court, after acknowledging that an agency's action is entitled to great deference, concluded that the NPS and FWS "failed to explain adequately the reasons for the closures," and that, therefore, the action was arbitrary and capricious.  Mausolf, 913 F. Supp. at 1343.  The evidence, according to the District Court, was insufficient to support the agency's action under the ESA.  The District Court found that the NPS's decision to effectuate these closures was "based on little more than speculation."  Id. at 1344.

The District Court, however, neglected to consider the closures in light of the NPS's authority arising from the organic act creating the NPS and the national park system, see 16 U.S.C. §§ 1, 3 (1994), from the regulations promulgated under these statutes that govern the management of all national parks, see 36 C.F.R. § 1.5(a), or from regulations promulgated to manage snowmobiling in Voyageurs Park in particular, see 36 C.F.R. § 7.33(b)(3).

The regulations designating routes for snowmobiling within the Park specifically grant the Park Superintendent the discretion temporarily to close routes and lake surfaces to snowmobiling after taking into consideration, among other factors, park

---

. . . by reducing the reproduction, numbers, or distribution of that species").  Therefore, we do not consider the propriety of the Park closures under provisions of the ESA prohibiting agency action likely to jeopardize the gray wolves' continued existence.

-12-

management objectives.[9]  The 1992 Park closure order, on its face, declares that the order was issued "[u]nder the authority of Title 36, Code of Federal Regulations, Chapter 1, Section 7.33(b)(3)."  See Addendum to 1992 Compendium.  This order was renewed in 1993, see 1993 Compendium, and in 1994, see 1994 Compendium, again under the authority granted the Superintendent under § 7.33(b)(3) to mandate temporary closures to effectuate park management objectives.

The Snowmobilers argue that the challenged Park closures are outside the Superintendent's authority under § 7.33(b)(3) because there is no stated time limit on the closure order.   However, these orders are issued as temporary, annual directives that must be reviewed and either renewed or repealed through yearly compendiums establishing the management goals for the Park.  Nothing in the language of the closure order indicates that it is intended to operate as a permanent closure and, because the orders are issued annually, the closures will be reviewed and either renewed or modified on a yearly basis.  Before the District Court enjoined enforcement of the closure order, the NPS, in conjunction with the FWS, was conducting just such a review to determine the benefits, if any, the closures have had on the wolf population and to determine whether the closures should be maintained, modified, or rescinded.  Consistent with its past practice, we hold that, under 36 C.F.R. § 7.33(b)(3), the NPS must conduct, at minimum, an annual review if snowmobile trails are to be closed

---

[9]36 C.F.R. § 7.33(b)(3) grants the Superintendent authority to "temporarily close trails or lake surfaces, taking into consideration public safety, wildlife management, weather, and park management objectives."  This Court has previously recognized the NPS's authority to effectuate Park closures pursuant to 36 C.F.R. § 7.33(b).  See Voyageurs Region Nat'l Park Ass'n v. Lujan, 966 F.2d at 428 ("We also observe that the final regulations provide for closure of given areas to snowmobile use 'taking into consideration . . . wildlife management.'") (citing 36 C.F.R. § 7.33(b)).

"temporarily" and such decisions must be supported by the record. The annual closure order is not outside the Superintendent's authority for lack of a specific time limit.[10]

As we have previously noted, agency actions are entitled to a great deal of deference and a "reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42 (1983). A reviewing court "may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." Id. at 43. This is not to say that the Superintendent's discretion to order Park closures is without limit. It must be exercised with an eye toward promoting specific regulatory objectives such as "protection of environmental or scenic values" or "protection of natural or cultural resources," 36 C.F.R. § 1.5(a), and it is subject to the arbitrary-and-capricious standard of review, see 5 U.S.C. § 706(2)(A) (1994); Environmental Defense Fund, Inc. v. Costle, 657 F.2d 275, 283 (D.C. Cir. 1981) ("The [arbitrary-and-capricious] standard mandates judicial affirmance if a rational basis for the agency's decision is presented, even though we might otherwise disagree.") (citations omitted). Whether an agency's action is arbitrary and capricious depends on whether "the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that

---

[10]Under § 1.5(b), except under emergency conditions, a closure "which is of a nature, magnitude and duration that will result in a significant alteration in the public use pattern of the park area . . . shall be published as rulemaking" in the Federal Register. 36 C.F.R. § 1.5(b). In this case, however, formal rulemaking was not required before the closure order was effective. As we have previously noted, snowmobiling in Voyageurs National Park is generally prohibited absent special regulations permitting the activity. See 36 C.F.R. § 2.18(c). Although the NPS neglected to enforce this provision and allowed snowmobiling to continue despite regulations to the contrary, the subsequent closure order restricting snowmobiling does not amount to a "significant alteration" in what was previously an unlawful public use of the park.

-14-

it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.

Applying this standard to the Park closure order, we cannot say that the NPS's decision is arbitrary and capricious. The evidence in the administrative record, while not overwhelming, is sufficient to provide a rational foundation on which the NPS could base its closure order. The NPS issued its closure order under authority granted by § 7.33(b)(3) to close portions of the Park temporarily in order to further management objectives--including preservation and protection of wildlife. This conclusion was reached after consultation with the FWS and was based on biological opinions and incidental take statements issued by that agency. These reports are contained in the administrative record and establish that the closures may prevent some incidental takings of gray wolves.

In its 1992 biological opinion, the FWS noted that the use of snowmobiles in areas of concentrated gray wolf activity "has been observed to cause the temporary disruption of gray wolf [feeding] activity." Biological Opinion at 7. While the FWS concluded that this type of disruption was insignificant in isolation, it determined that continued disruption of feeding activity by snowmobiles could have significant, negative cumulative effects[11] on individual wolves, especially during severe winters when prey availability dwindles. In its 1994 supplement to this biological opinion, the FWS noted that "[s]everal cases of harassment and harming of gray [wolves] have been reported within the Park in past years," and that "[i]n each documented case, access was gained to gray wolf habitat by motorized vehicle." 1994 Supplement to Biological Opinion. The FWS concluded that "[t]he problem lies with providing human access to gray wolf habitat that would not be provided without motorized vehicles." Id. A number of specific incidents are recounted, along with anecdotal evidence that

---

[11]The NPS must consider "cumulative effects" of proposed actions within national parks on endangered or threatened species. 50 C.F.R. § 402.14(g)(3).

harassment of gray wolves is not "an unheard of event." Id. at 5. While this evidence is not definitive, it does provide a rational basis on which the NPS could have concluded that the Park closures were a reasonable solution to the problem of gray wolf harassment.

The absence of definitive, irrefutable evidence in the record to establish the adverse connection between snowmobiling and incidental taking of gray wolves is not fatal to the NPS's closure order, since a reviewing court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc., 419 U.S. at 286. We conclude that the evidence in the administrative record on which the NPS based its decision to order the Park closures was sufficient to justify the determination and that the action was not arbitrary or capricious.[12]

Because the administrative record supports the closures as measures taken to protect wildlife under 36 C.F.R. § 7.33(b)(3), and under other regulatory provisions, see 36 C.F.R. §§ 1.5, 2.18, we reverse the judgment of the District Court and direct that judgment be entered in favor of the federal defendants and the intervenors.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[12]Because we conclude that the park closure is within the discretion granted to the NPS under other statutory and regulatory authority, we decline to consider the propriety of this closure under the ESA.