**UNITED STATES of America, Appellant,**

v.

**Gretchen BARLEY, Stephen S. Sayad, and Donald Kieselhorst, Respondents.**

**No. CR 04–0408 WHA.**

United States District Court, N.D. California.

June 2, 2005.

Denee A. Diluigi, United States Attorney's Office, San Francisco, CA, for Appellant.

Christopher J. Cannon, Sugarman & Cannon, San Francisco, CA, for Respondents.

Stephen S. Sayad, San Francisco, CA, pro se.

**ORDER OF AFFIRMANCE**

ALSUP, District Judge.

For the reasons stated by Magistrate Judge Elizabeth D. Laporte, the dismissals are AFFIRMED. All further issues raised on appeal are, in this Court's view, adequately answered as follows.

\* \* \* \* \* \*

Off-leash dog use had been a long tradition at various fields and beaches within what became the Golden Gate National Recreation Area in 1974. When the GGNRA was formed, an issue arose over the extent to which this tradition should continue. So far as this record reveals, neither the National Park Service nor anyone else then suggested that park service regulations might prohibit off-leash dog

use in the GGNRA. Rather, the issue was cast as one of balancing pet owners' recreation against public safety and resource protection. And, it was cast solely as a local issue for the GGNRA superintendent to decide.

After considerable input via the Golden Gate National Recreation Area Advisory Commission, a statutory creature, 86 Stat. 1302, the GGNRA superintendent adopted a policy of allowing off-leash dog use at seven or more locations within the GGNRA, including at Crissy Field and its beach but closing other sites altogether to pets. In this regard, the Advisory Commission's recommendations were adopted "in total" by the superintendent in 1978 (Tab B). In 1982, the off-leash areas were further incorporated into the GGNRA general management plan (Tab K).

Time and again, the NPS reiterated that off-leash dog use was allowed within the GGNRA (in designated areas). This came in 1992, for example, from no less authority than the legendary Stanley T. Albright, then the Regional Director of the Western Region (in a letter to a United States senator) (Tab D). In a 1995 letter, GGNRA Superintendent Brian O'Neill stated to the president of the San Francisco SPCA that "we have no intent to eliminate the availability of the Presidio's northern waterfront (including Crissy Field) as an off-leash dog-walking area" (Tab G).

Similarly, in 1993, the next regional director, John Reynolds, stated that the "GGNRA has adopted a pet policy that is more liberal than the regulations enforced at other national park sites throughout the United States, where pets are required to be leashed at all times ..." (Tab M). He added:

> GGNRA has, with the assistance of the park's Advisory Commission, established a pet policy that allows some opportunity for visitors to enjoy a few designated areas with their pets under less restrictive restraint. Certain areas of the park have been designated as voice-control areas where pets are allowed off-leash. Other sites are open only to leashed pets, and some portions of the park are closed to pets to protect sensitive resources.

Plainly, as this letter shows, the NPS regional director was aware of the general leash rule but understood that it had been relaxed and liberalized in the GGNRA. And at least implicitly his letter indicated that such relaxation was lawful.

In 1996, GGNRA Superintendent O'Neill "approved" and signed formal provisions entitled (Tab J):

Golden Gate National Recreation Area

Code of Federal Regulations
Title 36, Chapter 1

Compendium Amendment.

The preamble stated that the superintendent was issuing the rules in accordance with the following authorities:

> In accordance with regulations and the delegated authority provided in Title 36, Code of Federal Regulations, Chapter 1, Parts 1 through 7, authorized by Title 16, United States Code, Section 3, the following regulatory provisions are established for the proper management, protection, government and public use of the portions of Golden Gate National Recreation Area, the Presidio of San Francisco, Muir Woods National Monument, and Fort Point National Historic site under the jurisdiction of the National Park Service.

The rule designated Crissy Field (and its beach) for obedient pets on voice control, off-leash (Tab J). A note stated that the areas designated were subject to modification or termination for safety or resource protective reasons. Maps indicated the off-leash areas. (A year later, however,

the next revised compendium was silent as to off-leash areas.)

In March 1999, Superintendent O'Neill wrote the Honorable Nancy Pelosi stating that the GGNRA had adopted a pet policy more liberal than pet regulations at other national park sites throughout the country, stating that "[c]ertain areas of the park have been designated as voice control areas when pets are permitted off-leash" (Tab O). As above, the letter left no doubt that the superintendent knew of the general leash regulation but understood that the GGNRA had authorized more liberal designations permitting certain off-leash use.

In December 1999, Superintendent O'Neill stated in a letter to a San Francisco resident (Tab N):

> Traditionally, dogs have been allowed off-leash and under voice control along the entire Crissy Field promenade and waterfront. Dogs and their owners may continue to enjoy Crissy Field off-leash and under voice control in the cypress grove, the turf area near the Marina Street entrance, as well as along certain portions of the beach. Dogs will be allowed off-leash and under voice control in the West Bluff Picnic Area and in the airfield meadow when restoration of those areas has been completed. In off-leash areas, a dog must be leashed immediately if it displays aggressive behavior towards other visitors, dogs or wildlife, or is not immediately responding to voice commands.

A park brochure entitled "Enjoying the Park with Your Dog" stated "[d]ogs may be off leash under voice control on Crissy Field east of the west gate of the Golden Gate Promenade ..." (Tab P). An April 1998 NPS press release stated that the GGNRA had designated appropriate areas where dog walking could take place on- or off-leash without negatively impacting the resources or other uses (Tab Q).

In 2000, a heated controversy arose when the GGNRA closed a portion of Fort Funston, part of the GGNRA, to dog-walking. This Court heard the dispute and granted a preliminary injunction against the closure until the NPS complied with its own rule requiring notice and public comment prior to land closure of a "highly controversial" nature. *Ft. Funston Dog Walkers v. Babbitt*, 96 F.Supp.2d 1021 (N.D.Cal.2000).

\*    \*    \*    \*    \*    \*

In 2002, the NPS reversed field. In a Federal Register notice on January 11, 2002, the NPS acknowledged that "[f]or more than 20 years" a "voice control" policy had been in place within the GGNRA but stated that this had been "in error." The NPS stated that this policy was in conflict with a general nationwide regulation that all pets be on leash in all parks. 67 Fed. 0Reg. 1424 at 1425. The regulation, 36 C.F.R. 2.15(a)(2), prohibited park visitors from:

> Failing to crate, cage, restrain on a leash which shall not exceed six feet in length, or otherwise physically confine a pet at all times.

This new interpretation of the law was conceived by the United States Attorney's office in the *Fort Funston* litigation, according to government counsel herein, and then adopted by the NPS.

With the 2002 notice, the GGNRA began enforcement of the general leash rule and closed the entire park to off-leash use. The 2002 notice called for public comment on whether the GGNRA should adopt a local regulation making an exception to the general leash rule. One specific option on which comment was requested was whether "off-leash dog use" should be allowed "in specific locations within the park." The notice stated that "[t]his option would require rulemaking." *Id.* at 1430. So far,

no final rule has emerged from the 2002 notice.

\*　　\*　　\*　　\*　　\*　　\*

In sum, for more than twenty years, the GGNRA officially designated at least seven sites for off-leash use. This was not accidental. It was a carefully articulated, often studied, promulgation. The responsible GGNRA officials in 1978 and thereafter presumably believed they were acting lawfully. Even now, the government concedes that the GGNRA had full authority at all times to relax the general leash rule at the GGNRA but argues it could have done so, at least after 1983, only via a "special regulation." In other words, the agency allegedly used the "wrong" procedure back in 1978 (and thereafter) even though a "right" procedure to reach the desired result was available and could have been used. The government has not revealed its internal justification for following the "wrong" process. Whatever it was, the justification was abandoned in 2002 with the two-word explanation that it had been "in error." With this *ipse dixit,* the NPS wiped away two decades of policy, practice, promulgations, and promises to the public.

\*　　\*　　\*　　\*　　\*　　\*

All agree that the three accused were cited for off-leash dog walking at Crissy Field, an area open to such use since at least 1978 (until the 2002 closures). Judge Laporte held that the 2002 closures in question violated 36 C.F.R. 1.5(b). This order agrees.

In 1983, the NPS revamped its regulations and added a new provision to require notice-and-comment procedures before any "highly controversial" closure or opening of NPS land or before any such action that would have a major impact on visitor-use patterns. Specifically, this provision required a notice-and-comment procedure before "a closure, designation, use or activity restriction or condition, or the termi-

nation or relaxation of such, which is of a nature, magnitude and duration that will result in a significant alteration in the public use pattern of the park area ... or is of a highly controversial nature." 36 C.F.R. 1.5(b).

When Section 1.5(b) was adopted in 1983, the NPS explained that it was drafted to follow closely the Administrative Procedure Act for actions that would have a major impact on visitor-use patterns or were of a highly-controversial nature:

> Several commenters stated that this section will allow superintendents to make decisions without adequate public involvement. The Service believes that the regulation, as written, will have just the opposite effect. It was drafted to more closely pattern the notice and comment procedures of the Administrative Procedure Act. (5 U.S.C. 551, *et seq.*) This section requires superintendents to rely on notice and comment rulemaking for actions that will have a major impact on the visitor-use patterns for all or a portion of a park area, adversely affect the park's natural, aesthetic, scenic or cultural values, require a long-term or significant modification in the resource management objectives (or traditional visitor-use patterns of that unit), or are of a highly controversial nature. The public will be notified of actions that fall below this threshold in accordance with the procedures in § 1.7.

48 Fed.Reg. 30252, 30254 (June 30, 1983).

If the prior off-leash designations had been valid, it seems clear that the superintendent would have been required to honor Section 1.5 before terminating the designations in 2002, given that the termination was "highly controversial." The question presented is whether the same result should follow where, although the superintendent had been fully authorized to make the original designations and plainly

wished to do so, the procedure followed in making the original designations was flawed or at least arguably so. Judge Laporte was correct that the 2002 closures were "highly controversial" and the government's appellate brief herein did not argue otherwise. (The public, by the way, packed the courtroom on this appeal just as it had before Judge Laporte.) And, the government concedes that there was no "emergency" within the meaning of Section 1.5(b).

After more than twenty years of consistently approving and designating areas for off-leash dog walking, the GGNRA clearly engaged in an "activity restriction" when it suddenly reversed field, closed all areas for off-leash use, and started citing off-leash dog walkers. Not only did this activity restriction work a "significant alteration in the public use pattern of the park area," but it was of a "highly controversial nature." The whole point of Section 1.5(b) was to allow the public an opportunity to be heard *before* such a change occurred.

That requirement did not depend on the fine distinction now drawn by the government. The government contends that Section 1.5(b) was inapplicable because the original designations for off-leash use occurred via the wrong procedure and were procedurally flawed. In effect, the longstanding designations simply evaporated, the government argues, because they were void from Day One. The general leash rule, says the government, thus reigned at all times. But Section 1.5(b) has no such exception. To the contrary, it covers closures of a highly-controversial nature or that work a major change in public-use patterns. At a minimum, such notice-and-comment procedures would have allowed the public an opportunity to show that no procedural flaw had occurred and/or to persuade the agency to re-promulgate the desired designations in a proper way.

In this connection, there is room to question the government's evaporation theory. *First,* a strong argument can be made that the original procedural failure to give notice and invite comment under the Administrative Procedure Act was "harmless error" within the meaning of *Riverbend Farms, Inc. v. Madigan,* 958 F.2d 1479 (9th Cir.1992), especially in light of the extended ventilation of viewpoints on the off-leash designations over more than twenty years. In this connection, it was and remains curious that it was the agency itself, not a member of the public (for whose benefit that notice and comment was intended), that invoked the procedural omission to revise the designations.

*Second,* and alternatively, the government rests its theory on the 1983 revamp of NPS regulations. It argues that the proper way to have made the designation was via a "special regulation." True enough, the procedural requirements for a special regulation were not followed in 1978. Trouble is, when the off-leash areas were designated in 1978, a different and earlier set of NPS regulations applied, not the later revamped rules. *See* 36 C.F.R. Parts 1–7 (1978). Although the earlier regime still prohibited off-leash dogs as a general matter, there was nothing then that restricted the local authority of each superintendent to make activity designations on a park-by-park basis contradicting the national regulations. That restriction came later in 1983—when Section 1.5 (Closures and Public Use Limits) itself was introduced, among other changes. The 1983 change cautioned that, going forward, the use-designation provision of the new Section 1.5 should not be invoked to circumvent a general regulation. 48 Fed. Reg. at 30262 (col.1). In the period leading up to the 1983 amendment, therefore, we must presume that the GGNRA designations were lawful. (The government has

not shown otherwise.) Nothing in the 1983 regulations set aside *then-extant* use designations.

This order does not turn on the correctness of these legal responses to the evaporation theory. The main point is that they are plausible responses that could have been submitted during a notice-and-comment process. And, even if not ultimately persuasive to the GGNRA, the comments might have led the GGNRA to cure the procedural snafu by simply re-issuing the designations in the "right" manner. Government counsel conceded at the hearing that it would not be burdensome to have done so.

Contrary to the government, the GGNRA has *not* carried out the notice-and-comment process envisioned by Section 1.5(b). It is true that the 2002 Federal Register notice advised that the old policy had been "in error" and announced closures. But Section 1.5(b) required that the notice and comment come *before* the closures, not *after* the closures. (No action has, moreover, yet resulted from the 2002 notice.)

\* \* \* \* \* \*

This affirmance in no way restricts the authority of the superintendent or the NPS to "protect the resource," including the protection of endangered and threatened species. After the notice and comment under Rule 1.5(b), the superintendent is plainly authorized to adopt such closures as are reasonably necessary or appropriate to protect the resource even at the expense of fully closing the park to all off-leash use. Congress has committed the proper balance of resource protection and recreation to the park professionals. Their judgments should be respected by the courts absent a violation of the law. But here there was a violation of the law—a violation of the NPS' own regula-

tion requiring notice and comment before making a dramatic land-use change. Affirmance, therefore, is required. It is, therefore, unnecessary to reach the cross-appeal.

\* \* \* \* \* \*

On appeal, the government represented that "Magistrate Judge Laporte raised *sua sponte* 36 C.F.R. § 1.5(b) ...." This representation was evidently made to justify the government's attempt on appeal to add new materials to the record that had not been placed before Judge Laporte. The government's representation is untrue. This Court has gone back into the briefs below. The opening motion to dismiss cited to Section 1.5(b) numerous times, most cogently at pages 17–20. The opposition brief below (by the government) neglected to address the argument. That omission was a tactical choice made by government counsel. It was unfair and disappointing that on appeal the government claimed that Judge Laporte, on her own and without notice, reached out and ruled on the basis of unbriefed arguments. All exhibits and materials submitted on appeal that were not laid before Judge Laporte are thus stricken. That said, it should also be said that none of them would have altered the outcome.

**IT IS SO ORDERED.**